J. S67012/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF:  M.P., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF:  M.P., A MINOR | : | |
| | : | No. 3117 EDA 2015 |

Appeal from the Dispositional Order, September 15, 2015,
in the Court of Common Pleas of Philadelphia County
Juvenile Division at No. CP-51-JV-0001519-2015

BEFORE:  FORD ELLIOTT, P.J.E., RANSOM, J. AND STEVENS, P.J.E.*

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED October 6, 2016.**

M.P. appeals from the September 15, 2015 juvenile dispositional order entered in the Court of Common Pleas of Philadelphia County adjudicating her as delinquent, placing her on probation, and releasing her to the custody of her father, after she was adjudged delinquent by the juvenile court for recklessly endangering another person ("REAP"), possession of an instrument of crime ("PIC"), and aggravated assault.[1]  We affirm.

The juvenile court set forth the following factual history:

> On July 12, 2015 at approximately 2:30 [p.m.], Kashia Jones drove from work to the area of 1530 S. 53rd Street, which is at a distance of two blocks from her home, located at 1205 S. 54th Street.  Ms. Jones went to said area, because she was aware that her son's current girlfriend and past girlfriend were going to fight.  The current girlfriend was Lashay and the former girlfriend was Willa Dean.

---

* Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2705, 907(a), and 2702(a), respectively.

Ms. Jones' son is named Khaleeq Williams. M.P. was standing over top of the two girls who were fighting. Ms. Jones was three to four feet away. M.P. had a skinny steak knife, approximately four to five inches long, in her hand and she was trying to hit Lashay. M.P. appeared to be attempting to poke Lashay with the knife. Ms. Jones grabbed M.P.'s hand, and put it behind her back, forcing M.P. to drop the knife, which was recovered by Ms. Jones. M.P. told Ms. Jones to get off of her and she walked in the direction of what appeared to be an abandoned house.

The house was approximately six feet away. The house had dilapidated white steps and a grassy area in front of the steps. As M.P. walked into the house, the two girls remained fighting. M.P. reemerged from the house screaming and yelling, holding a blue aluminum bat with a black base. M.P. was yelling "Get the F away" and swinging the bat. Ms. Jones asked her to stop swinging the bat and M.P. told Ms. Jones to get out of her face. Ms. Jones stepped away and M.P.'s friend approached Ms. Jones and swung her arm toward Ms. Jones. Ms. Jones grabbed the friend's arm, placed the friend on the ground, and got on top of the friend. Ms. Jones heard a sound and then heard someone comment that she got hit on the head with a bat. Ms. Jones felt and saw blood on the back of her head. Ms. Jones still saw M.P. holding the bat. Ms. Jones asked M.P. why she hit her with the bat and M.P. responded "that's why I F'ed you up, that's why I F'ed you up."

Ms. Jones suffered a concussion and received a CAT scan. Ms. Jones received two to three deep sutures and five staples in her head. Ms. Jones has scarring from the wound and still sees a neurologist as a result of this incident, and still suffers from painful headaches once or twice a week. Ms. Jones has missed work as a phlebotomist as a result of this injury. Ms. Jones was unsure if she had told the detectives that M.P. had a knife that day. Ms. Jones did tell the detectives that M.P. told her "that's why I

F'ed you up, that's why I F'ed you up." Ms. Jones' son and a group of other boys were also present at the scene. Her son was engaged in a fight with another individual.

After the incident, Ms. Jones drove to the hospital, accompanied by her son to make sure she remained conscious. Two of Ms. Jones' sons were fighting at the scene.

Khaleeq Williams was fighting on the scene, at which M.P. was also present fighting. Mr. Williams had seen M.P. associating with Willa Dean prior to the fight. M.P. was screaming and holding a knife, while Willa and Lashay were fighting. Mr. Williams testified consistently with his [sic] Ms. Jones, in that Ms. Jones took the knife from M.P. and that M.P. obtained a bat from the house. Mr. Williams testified that M.P. was swinging the bat wildly, that M.P. hit his brother on the head with the bat, and that M.P. eventually hit Ms. Jones on the head with the bat. Mr. Williams drove half of the way to the hospital, because Ms. Jones was losing consciousness. Mr. Williams went to the scene with three other people to fight Willa's brother.

M.P. testified in her own defense, but the court did not find her credible and found that her testimony was mostly self-serving. This court does not believe that the knife fell out of her pocketbook as she claimed. This court finds that Mr. Williams and Ms. Jones testified credibly that M.P. had brandished the knife during the fight. M.P. admitted that she was swinging the bat and that the bat hit Ms. Jones on the head. M.P. also confirmed that she hit Mr. Williams' brother with the bat. This court does not believe that M.P. was swinging the bat to "scare them" as she claims. This court also notes that the appellant failed to provide notice of a self-defense claim or defense-of-others claim. Furthermore, although the appellant's attorney argued that Ms. Jones was slamming Willa's head into the ground, there was no evidence on the record supporting said argument.

M.P.'s father[] testified that M.P. has a reputation for being truthful and peaceful. This court did not give [his] testimony any weight.

After finding M.P. guilty of said charges and reviewing her history, the court believed that M.P. was in need of treatment, rehabilitation, and supervision. M.P.'s mother reported that M.P. has a history of running away on two occasions, causing the family to file a missing person's report. M.P. was reported to suffer from anger issues and anxiety. M.P. has also refused medication while in therapy. This court acknowledges that M.P.'s behavior has improved since living with her father; however, this event occurred while M.P. was already living with her father, according to Lauren McLaughlin Willias, the Community Umbrella Agencies [sic] [] case management supervisor.

Upon being adjudicated, M.P. stated "That's what I'm saying. I believe I was in the wrong place at the wrong time. I didn't intend to or mean to hurt anybody. It wasn't like on purpose. I apologize and that's it." This court disagrees with M.P.'s assessment. This court believes that M.P. still does not realize what she did, that M.P. has failed to show remorse for her actions, and that M.P. is in in [sic] further need of treatment, supervision, and rehabilitation.

Juvenile court opinion, 1/21/16 at 1-4 (citations to notes of testimony omitted).

The juvenile court set forth the following procedural history:

On July 12, 2015, Philadelphia police arrested [M.P.] and charged her with [aggravated assault, simple assault, PIC, and REAP]. On September 15, 2015, M.P. went to trial and was found guilty of [aggravated assault, PIC, and REAP]. On said date, M.P. was adjudged delinquent and the court placed M.P. on probation.

*Id.* at 1. This timely appeal followed.

Appellant raises the following issue for our review:

> Did not the juvenile court err as a matter of law and abuse its discretion in adjudicating appellant delinquent where the evidence established that she was not in need of treatment, rehabilitation or supervision?

Appellant's brief at 2.

"The Juvenile Act grants juvenile courts broad discretion when determining an appropriate disposition. . . . We will disturb a juvenile court's disposition only upon a showing of a manifest abuse of discretion." In the *Interest of T.L.B.*, 127 A.3d 813, 817 (Pa.Super. 2015) (citation omitted). An adjudication of delinquency requires both findings "(1) that the juvenile has committed a delinquent act; and (2) that the juvenile is in need of treatment, supervision, or rehabilitation." *Commonwealth v. M.W.*, 39 A.3d 958, 959 (Pa. 2012). "In a juvenile proceeding, the hearing judge sits as the finder of fact." *In re L.A.*, 853 A.2d 388, 391 (Pa.Super. 2004) (citation omitted). "The weight to be assigned the testimony of the witnesses is within the exclusive province of the fact finder." *Id.* (citation omitted).

Here, no dispute exists that following the adjudicatory hearing, the juvenile court correctly found that M.P. committed delinquent acts; specifically, the crimes of aggravated assault, REAP, and PIC. Rather, M.P. complains that the evidence demonstrated that she is not in need of

treatment, supervision, or rehabilitation because the Commonwealth did not present evidence that contradicted the testimony of Lauren McLaughlin Willis, the case management supervisor at Community Umbrella Agencies.

The record reflects that although Ms. Willis testified that M.P.'s behavior has significantly improved since she moved in with her father in May of 2015, Ms. Willis never opined that M.P. is not in need of treatment, supervision, and/or rehabilitation. (Notes of testimony, 9/15/15 at 80-86.) M.P. nevertheless claims that Ms. Willis' testimony established that she does not need treatment, supervision, and/or rehabilitation and because the juvenile court ignored that testimony, it abused its discretion. Contrary to M.P.'s claim, the juvenile court found that neither this evidence, nor any other, was persuasive enough to tip the scales in M.P.'s favor. (Juvenile court opinion, 1/21/16 at 7.) As finder-of-fact, it was within the juvenile court's exclusive province to assign weight to the testimony. **See in re L.A.**, 853 A.2d at 319.

The record further reflects that the incident giving rise to M.P.'s delinquency adjudication occurred approximately two months after M.P. moved in with her father. (**Id.** at 84, 86.) The juvenile court took this fact, as well as many others, into consideration before finding that M.P. needs treatment, supervision, and rehabilitation. (Juvenile court opinion, 1/21/16 at 7.) In making its determination, the juvenile court considered the fact that when M.P. struck the victim in the head with an aluminum baseball bat,

she could have killed the victim. (Notes of testimony, 9/15/15 at 90.) The juvenile court also considered M.P.'s decision to become involved in the fight, as well as her decision to escalate the situation, as opposed to calling the police or simply walking away. (***Id.***) Because of that, the court determined that M.P. needs to learn how to make better decisions in crisis situations. (***Id.***) The court also determined that M.P.'s statements during the adjudicatory hearing demonstrated her failure to realize what she did, as well as her lack of remorse. (Juvenile court opinion, 9/15/15 at 7.) Based on M.P.'s criminal acts, behavioral history, incredulous testimony, and how she minimalized her criminal acts, the juvenile court was "convinced" that M.P. needs treatment, supervision, and rehabilitation. (***Id.*** at 7-8.)

After reviewing the record, we find no abuse of discretion.

Dispositional order affirmed.

Judgment Entered.

JosephD.Seletyn,Esq.
Prothonotary

Date: 10/6/2016

- 7 -